IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

RONALD CUNAGIN, as father and
next friend of J.C., an infant,

          Plaintiff,

v.                                CIVIL ACTION NO.   3:19-0250

CABELL HUNTINGTON HOSPITAL, INC.,
a West Virginia corporation,

          Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is a Motion to Dismiss the Plaintiff's Amended Complaint (ECF No. 71) by Defendant Cabell Huntington Hospital, Inc. (Defendant CHH) and a Motion to File a Surreply by Plaintiff Ronald Cunagin, as father and next friend of J.C., an infant. ECF No. 82.[1] For the following reasons, the Court **DENIES, in part,** and **GRANTS, in part,** Defendant CHH's motion and **DENIES** Plaintiff's motion.

**I.
FACTUAL ALLEGATIONS**

In the Amended Complaint, Plaintiff alleges his infant son J.C. was born prematurely on July 15, 2017, and he was hospitalized at Defendant CHH. *Am. Compl.* at ¶¶ 5, 18, ECF No. 69. While at the facility, J.C. was diagnosed with "'an acute facture of the right humeral diaphysis with significant displacement and angulation . . . [and] . . . a [p]alpable deformity of the

---

[1]The proposed Sur-Reply is styled as both a Sur-Reply and Motion to Strike. *See Motion to Strike Certain Portions of Defendant's Reply Brief in Support of Motion to Dismiss and Plaintiff's Sur-Reply to said Motion Pending Permission of the Court and Statement Concerning Argument Motion to* Strike, ECF No. 82-1.

right humerus, no lacerations, ecchymosis swelling[.]'" *Id.* at ¶11 (internal quotation marks omitted). On August 23, J.C. was transferred to Pikeville Medical Center (PMC) and, four days later, he was transferred to the University of Kentucky Health Care (UKHC). *Id.* at ¶5. Shriners Hospital for Children Medical Center (SHC) also conducted an evaluation of J.C. *Id.* These three medical centers diagnosed J.C. with multiple bone fractures. *Id.* at ¶6. Specifically, Plaintiff states J.C. had three broken ribs, a broken arm, and broken legs. *Id.* at ¶8. J.C. was discharged to his parents' care on September 10, 2017. *Id.* at ¶5.

According to Plaintiff, the fractures were ruled non-accidental trauma and all occurred while J.C. was a patient in either the Neo-Natal Intensive Care Unit (NICU) or the Neo-Natal Therapeutic Unit (NTU) of Defendant CHH. *Id.* at ¶5. As J.C. and his parents are residents of Kentucky, the abuse was investigated by the Kentucky Cabinet for Health and Family Services (the Cabinet). *Id.* at ¶¶7, 8. After conducting interviews, the Cabinet found "'[t]he only people that had access to the child without supervision were the medical staff (unknown perp) leading the Cabinet to believe that an unknown person caused deliberate harm to the child'" while he was hospitalized at CHH. *Id.* at ¶7. The Cabinet concluded the perpetrator(s) was/were allowed by Defendant CHH to enter the NICU and NTU and inflict deliberate harm on the child. *Id.* at ¶8. Specifically, the Cabinet found "the parents never had the opportunity to have injured their child and they did not injure him[.]" *Id.* Additionally, the Cabinet stated that testing did not reveal any genetic or metabolic bone abnormality. *Id.*

Plaintiff maintains that J.C.'s injuries in no way occurred as or during medical treatment, and do not fall within the definition of "healthcare" contained in West Virginia Code

§ 55-7B-2(e) (2017). *Id*. at ¶¶13, 14. Instead, Plaintiff alleges that Defendant CHH tortiously permitted someone to have access to J.C. and that person intentionally committed child abuse in violation of West Virginia Code § 61-8D-3 (2014). *Id*. at ¶¶15, 16; *see* W. Va. Code § 61-8D-3 (establishing the criminal penalties under West Virginia law for acts of child abuse resulting in injury). Plaintiff alleges the lack of reasonable safety measures on the premises violated Defendant CHH's duty, as "the custodial entity," to protect J.C. *Id*. at ¶25. Plaintiff claims such conduct was so atrocious, intolerable, extreme, reckless, and outrageous, exceeding all bounds of decency, that it establishes a claim for a Tort of Outrage (Count I). *Id*. at ¶¶25, 26.

In Count II, Plaintiff also alleges Defendant CHH knew or should have known it was necessary to establish and enforce security measures, with proper supervision, to "provide a reasonably safe place for J.C." while hospitalized. *Id*. at ¶28. Despite foreseeable and preventable harm, Plaintiff contends Defendant CHH negligently performed these duties and, as a result, J.C. suffered serious and permanent non-accidental traumatic injuries. *Id*. at ¶¶28-30. Therefore, in Count II, Plaintiff asserts a claim of Negligent Supervision and Premises Liability against Defendant CHH.

Turning to Counts III and IV, Plaintiff alleges related claims involving spoliation of evidence. In Count III, Plaintiff makes a claim of Negligent Spoliation of Evidence, and in Count IV, he makes a claim for Intentional Spoliation of Evidence. With respect to these counts, Plaintiff states that Defendant CHH had actual knowledge of J.C.'s fractured leg, but it failed to report the abuse as required by West Virginia law to the appropriate governmental and law enforcement agencies and covered up the abuse. *Id*. at ¶¶32, 33; *see* W. Va. Code § 49-2-803

(2015) (stating, in part, "[a]ny medical . . . professional . . . who has reasonable cause to suspect that a child is . . . abused, . . . shall immediately, and not more than forty-eight hours after suspecting this abuse . . ., report the circumstances or cause a report to be made to the Department of Health and Human Resources. In any case where the reporter believes that the child suffered serious physical abuse . . ., the reporter shall also immediately report, or cause a report to be made, to the State Police and any law-enforcement agency having jurisdiction to investigate the complaint").[2] Plaintiff asserts Defendant CHH refuses to provide Plaintiff with video or digital images and information about surveillance and security at the NICU and NTU. *Id*. at ¶36. "To the extent the evidence in the control of CHH is not available or has been lost, discarded or destroyed, [Plaintiff claims] Defendant CHH is guilty of negligent spoliation of evidence" and/or "intentional spoliation of evidence." *Id*. at ¶¶37, 39.

In Count V, Plaintiff invokes the doctrine of *res ipsa loquitur*.[3] Plaintiff asserts Defendant CHH negligently "fail[ed] to supervise or enforce security for the infant J.C. . . . and

---

[2]In his Amended Complaint, Plaintiff cites West Virginia Code § 49-6A-2. *Am. Compl.* at ¶22. However, this section was amended and reenacted as West Virginia Code § 49-2-803 in 2015. This section was amended again in 2018 but, as the events of this case occurred in 2017, the June 12, 2015 version applies.

[3]The West Virginia Supreme Court has held that, under the doctrine of *res ipsa loquitur*,

> "it may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when (a) the event is of a kind which ordinarily does not occur in the absence of negligence; (b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and (c) the indicated negligence is within the scope of the defendant's duty to the plaintiff."

Syl. Pt. 3, *Dickens v. Sahley Realty Co.*, 756 S.E.2d 484 (W. Va. 2014) (quoting Syl. Pt. 4, *Foster v. City of Keyser*, 501 S.E.2d 165 (W. Va. 1997)). To have the doctrine apply to avoid summary

fail[ed] to provide J.C. with a reasonably safe premise[, which was] solely within the scope of defendant's duty to provide, supervise and enforce security for infant J.C." *Id.* at ¶¶ 41, 42(b), (c). Plaintiff maintains this negligence resulted in J.C.'s harm. *Id.* at ¶41.[4]

In its motion, Defendant CHH argues Plaintiff's claims arise under the West Virginia Medical Professional Liability Act (MPLA), West Virginia Code § 55-7B-1 *et seq.*, but Plaintiff did not comply with the statutory requirements. As a result, Defendant CHH contends Plaintiff has failed to state a claim under Rule 12(b)(6) and this Court lacks jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Plaintiff insists, however, the MPLA is irrelevant to his claims.

## II.
## STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure raises the fundamental question of whether a court is competent to hear and adjudicate the claims brought before it. It is axiomatic that a court must have subject matter jurisdiction over a controversy before it can render any decision on the merits. Challenges to jurisdiction under Rule 12(b)(1) may be raised in two distinct ways: "facial attacks" and "factual attacks." *Thigpen v. United States*, 800 F.2d 393, 401 n.15 (4th Cir.1986) (Murnaghan, CJ, concurring), *rejected on other grounds*, *Sheridan v. United States*, 487 U.S. 392 (1988). A "facial attack" questions whether

---

judgment, all three prongs of this test must be met. Syl. Pt. 4, in part, *id*. (citation omitted). Additionally, "[t]he doctrine applies only in cases where defendant's negligence is the only inference that can reasonably and legitimately be drawn from the circumstances." Syl. Pt. 5, in part, *id*. (emphasis original; internal quotation marks and citations omitted).

[4]Plaintiff has two additional counts in the Amended Complaint. In Count VI he requests compensatory damages, and in Count VII he requests for punitive damages.

the allegations in the complaint are sufficient to sustain the court's jurisdiction. *Id*. When, as here, a party makes a "facial attack," the court must accept the allegations in the complaint as true and decide if the complaint is sufficient to confer subject matter jurisdiction. *Id*.[5]

Under Rule 12(b)(6), the Court also must look for "plausibility" in the complaint. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard requires a plaintiff to set forth the "grounds" for an "entitle[ment] to relief" that is more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. (internal quotation marks and citations omitted). Accepting the factual allegations in the complaint as true (even when doubtful), the allegations "must be enough to raise a right to relief above the speculative level[.]" *Id*. (citations omitted). If the allegations in the complaint, assuming their truth, do "not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id*. at 558 (internal quotation marks and citations omitted).

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court explained that, although factual allegations in a complaint must be accepted as true for purposes of a motion to

---

[5]On the other hand, a "factual attack" challenges the truthfulness of the factual allegations in the complaint upon which subject matter jurisdiction is based. In this situation, a "district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir.1991) (citing *Adams v. Bain*, 697 F.2d 1213,1219 (4th Cir. 1982); *Trentacosta v. Frontier Pac. Aircraft Indus.*, 813 F.2d 1553, 1558 (9th Cir.1987)). To prevent dismissal, "the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists." *Id*. (citations omitted). A dismissal only should be granted in those instances in which "the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id*. (citations omitted).

dismiss, this tenet does not apply to legal conclusions. 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citation omitted). Whether a plausible claim is stated in a complaint requires a court to conduct a context-specific analysis, drawing upon the court's own judicial experience and common sense. *Id*. at 679. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*.

## III.
## DISCUSSION

Pursuant to the MPLA, a medical professional liability action ordinarily may not be filed against "any health care provider" unless a plaintiff first timely and properly serves the health care provider with a screening certificate of merit. W. Va. Code § 55-7B-6(a), (b).[6] A failure to provide the required notices under the MPLA deprives a court of subject matter jurisdiction. *See Syl. Pt. 2, State ex rel. PrimeCare Med. of W. Va., Inc. v. Faircloth*, 835 S.E.2d 579 (W. Va. 2019) ("The pre-suit notice requirements contained in the [MPLA] are jurisdictional, and failure to provide such notice deprives a circuit court of subject matter jurisdiction."). In this case, Defendant CHH argues Plaintiff's allegations of negligent supervision and premise liability are encompassed within the rendering of health care under the Act. As such, Defendant CHH asserts it is entitled to the protections of the MPLA, including pre-litigation notices before suit can be filed against it. As it is undisputed that Plaintiff did not provide such notices, Defendant CHH contends the case must be dismissed.

---

[6]There is an exception in subparagraph (c) where it is believed "no screening certificate of merit is necessary because the cause of action is based upon a well-established legal theory of liability which does not require expert testimony supporting a breach of the applicable standard of care[.]" W. Va. Code § 55-7B-6(c), in part.

On the other hand, Plaintiff argues that he did not have to provide Defendant CHH a screening certificate of merit because the core allegations in the Amended Complaint do not arise under the MPLA. Instead, his core allegations are that Defendant CHH failed to fulfill its duty to provide J.C. a safe environment due to lapses in security at the facility. Plaintiff insists he has made no allegation in the Amended Complaint that Defendant CHH breached a duty related to the medical treatment J.C. received and, thus, the MPLA simply does not apply.

Defendant CHH disagrees and maintains the MPLA is interpreted broadly and, as such, encompasses Plaintiff's claims. In support of its position, Defendant CHH cites *Minnich v. MedExpress Urgent Care, Inc.*, 796 S.E.2d 642 (W. Va. 2017), and *Faircloth*. Upon review, however, the Court finds *Minnich* and *Faircloth* clearly are distinguishable from the present case.

In *Minnich*, the plaintiff's husband sought medical care at a MedExpress, a health care provider under the Act. 796 S.E.2d at 643-44. Once at the facility, a medical assistant, employed by MedExpress, spoke with the plaintiff and her husband to evaluate his condition in a triage area. *Id*. at 644. According to the plaintiff, they told the medical assistant that Mr. Minnich recently had hip surgery and had just started walking without assistance. *Id*. Thereafter, the medical assistant escorted the couple to an examination room, where she reportedly told Mr. Minnich to sit on an examination table. *Id*. After the medical assistant left the room, Mr. Minnich attempted to get on the table by using the table's retractable step, but he fell into the plaintiff causing them both to be injured. *Id.* Mr. Minnich ultimately died, which the plaintiff attributed to his fall. *Id*. at n.9.

The plaintiff then filed claims against MedExpress for premise liability, loss of consortium, and wrongful death. *Id*. On summary judgment, the circuit court found the plaintiff's premise liability theory was really a medical malpractice claim. Thus, the court held she had to comply with the notice requirements of the MPLA. *Id*.

On appeal, the West Virginia Supreme Court found the medical assistant was a "health care provider" under the MPLA because she was an employee of a health care facility and acted within the scope of her employment. *Id*. at 645-46. However, the inquiry did not end there. The West Virginia Supreme Court also considered whether the medical assistant was providing "health care" within the meaning of the MPLA. To this point, the Court rejected the plaintiff's argument her husband had not received any health care services prior to his fall, finding the intake procedures of gathering medical history and taking vital signs are integral components of health care. *Id*. at 647. Additionally, Mr. Minnich's fall occurred during the course of his evaluation and on medical equipment that "was necessarily part of the health care services MedExpress undertook to provide Mr. Minnich." *Id*. Moreover, the Court found expert testimony would be necessary because the plaintiff specifically raised the issue of whether the medical assistant acted within the standard of care in rendering health care, having been aware of Mr. Minnich's ambulatory restrictions, yet not assisting him onto the examination table. *Id.* Given the manner in which the plaintiff pled her case, the Court agreed with the circuit court that the MPLA controlled the claim. *Id*. at 648.

In *Faircloth,* an inmate at the Eastern Regional Jail and Corrections Facility committed suicide. 242 S.E.2d at 583. Thereafter, the Estate brought an action against a

correctional officer, the West Virginia Regional Jail and Correctional Facility Authority (the Regional Jail Authority), and PrimeCare Medical of West Virginia, Inc. (PrimeCare). *Id*. at 582.[7] In part, the Estate alleged "*Defendants* knew or should have known [the deceased] was addicted to heroin and a possible suicide risk." *Id*. at 583 (emphasis added in *Faircloth*; internal quotation marks omitted). The Estate also alleged, in part, that PrimeCare and the Regional Jail Authority acted in concert with one another to provide medical screening and monitoring of inmates at the facility, and they failed to supervise and properly train the defendant correctional officer. *Id*. Additionally, the Estate claimed PrimeCare and the Regional Jail Authority failed to intervene on the deceased's behalf, were deliberately indifferent to him, and allowed him to commit suicide while he was in protective custody. *Id*.[8] PrimeCare moved to dismiss the claims, in part, because the Estate did not comply with the MPLA.

Upon order of the circuit court, the Estate filed a notice of claim, but it maintained it did not need to file a screening certificate of merit because "its theory of liability was well-established" and expert testimony was unnecessary to set forth the standard of care. *Id*. at 584. PrimeCare objected, but the circuit court denied its motion to dismiss. *Id*.

On appeal, the West Virginia Supreme Court determined the Estate's claims against PrimeCare were based upon "*health care services* rendered, or which should have been rendered,

---

[7] PrimeCare was added in an amended complaint. *Id.*

[8] There also were claims for negligent retention, firing, and staffing. *Id*. The West Virginia Supreme Court noted it was unclear whether the inmate was on suicide watch when he took his life. *Id*. at n.3.

by a *health care provider* or *health care facility* to a patient," amounting to a "medical professional liability" action. *Id*. at 587 (citing W. Va. Code § 55-7B-2(i) (2015) (internal quotation marks omitted).[9] Specifically, the Court noted that the phrase "medical professional liability" includes "other claims that may be *contemporaneous to or related to* the alleged tort or breach of contract or otherwise provided, all *in the context of rendering health care services*." *Id*. at 586 (quoting W. Va. Code § 55-7B-2(i), in part; emphasis added in *Faircloth*; footnote omitted). Additionally, the Court recognized that the phrase "health care" is defined under the statute as:

> "(1) *Any act, service or treatment* provided under, pursuant to or in the furtherance of a physician's plan of care, *a health care facility's plan of care, medical diagnosis or treatment*;
>
> (2) Any act, service or treatment *performed or furnished, or which should have been performed or furnished, by any health care provider or person supervised by or acting under the direction of a health care provider or licensed professional* for, to or on behalf of a patient during the patient's medical care, treatment or *confinement*, including, but not limited to, *staffin*g, medical transport, *custodial care* or basic care, infection control, positioning, hydration, nutrition and similar patient services; and
>
> (3) The process employed by health care providers and health care facilities for the appointment, *employment,* contracting, credentialing, privileging and *supervision of health care providers*."

---

[9]West Virginia Code § 55-7B-2 was amended in 2017, and added a subsection defining the word "occurrence" as including:

> any and all injuries to a patient arising from health care rendered by a health care facility or a health care provider and includes any continuing, additional or follow-up care provided to that patient for reasons relating to the original health care provided, regardless if the injuries arise during a single date or multiple dates of treatment, single or multiple patient encounters, or a single admission or a series of admissions.

W. Va. Code § 55-7B-2(l) (2017). Other than stylistic changes, the remainder of West Virginia Code § 55-7B-2 was unchanged.

*Id*. (quoting W. Va. Code § 55-7B-2(e); emphasis added in *Faircloth*). Moreover, a "health care facility" includes "'*any state-operated institution or clinic providing health care*'" and a "health care provider" is

> "*any person taking actions or providing service or treatment providing service or treatment pursuant to or in furtherance of a physician's plan of care, a health care facility's plan of care, medical diagnosis or treatment;* or a health care provider acting in the course and scope of the officer's, employee's or agent's employment."

*Id*. at 586-87 (quoting W. Va. Code § 55-7B-2(g), in part; emphasis added in *Faircloth*).

In considering the allegations against PrimeCare, the Court found there were three basic claims. One was failing to assess the decedent's risk of suicide. Two was its failure to monitor and house the decedent based upon PrimeCare's alleged knowledge of the decedent's risk. Three was its failure to "train, monitor, and discipline" the defendant correctional officer to monitor the decedent. Given that these allegations fit within the statutory definition of "health care" and "were '*health care services* rendered, or which should have been rendered, by a *health care provider* or *health care facility* to a patient[,]'" the West Virginia Supreme Court held the MPLA applied, the Estate failed to comply with the pre-suit notice requirements, and the circuit court lacked subject matter jurisdiction. *Id*. at 587, 589 (quoting, in part, W. Va. Code § 55-7B-2(i), in part; emphasis added in *Faircloth*).

Defendant CHH maintains that in both *Minnich* and *Faircloth* the phrase "health care" was applied broadly to acts beyond medical treatment and it was recognized the phrase "health care providers" statutorily includes employees and agents of the health care facilities. Additionally, Defendant CHH states that *Faircloth* establishes that employees, such as security

guards, who are responsible for the safety and security of premises, are "health care providers" under the MPLA. Therefore, Defendant CHH argues Plaintiff's claim arise under the MPLA.

Though written broadly, the MPLA is nonetheless applicable only in the context of "health care" and not intended to preempt every conceivable claim which might occur between a patient and a medical provider that is unrelated to health care. The legislative findings set forth in West Virginia Code § 55-7B-1 (2015) of the MPLA address a crisis in West Virginia's common law medical malpractice arena, balancing the interests of medical care and health care providers with those of patients injured as a result of negligent acts by health care providers. Throughout the relevant definition in West Virginia Code § 55-7B-2(e) of "health care," the language tethers the Act's protections to those providing health care and medical services, and not just to a physical location like a hospital or to the conduct of every employee including those not involved in health care. For instance, subsection (2) lists "but not limited to, staffing, medical transport, custodial care or basic care, infection control, positioning, hydration, nutrition and similar patient services," all matters relating to health care or medical conditions. It does not purport to cover premises liability, such as an unattended slippery floor, an unsecured handrail, or negligent security guard.

Further, it is clear that, in both *Minnich* and *Faircloth,* the West Virginia Supreme Court applied the statutes in light of the specific allegations made by the plaintiffs in those cases. In both cases, the alleged tortious acts occurred within the scope of an "act, service or treatment provided under, pursuant to or in the furtherance of a . . . *a health care facility's plan of care, medical diagnosis or treatment*." W. Va. Code § 55-7B-2(e), in part. In *Minnich*, the Court found the decedent fell during the course of medical treatment and on equipment that "was necessarily

part of the health care services MedExpress undertook to provide" him. 796 S.E.2d at 647. In *Faircloth*, the claim related to the correctional officer was based on PrimeCare's alleged "failure to train, monitor, and discipline" the officer with regard to monitoring the decedent's medical condition, that is, his risk of suicide. The guard's monitoring of the suicide risk was integral to the medical care. It was not a claim, as here, that a lapse in security resulted in an assault. Instead, in this case, the Court finds Plaintiff narrowly drafted the core allegations of his Amended Complaint to avoid claims arising under the Act.

Additionally, given these allegations, requiring Plaintiff to comply with the screening certificate of merit under the MPLA would be nonsensical. Under the MPLA as it existed when this action was filed, the certificate of merit must

> be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death.

W. Va. Code § 55-7B-6(b) (2017), in part.[10] The "standard of care and a defendant's failure to meet the standard of care" under the MPLA further must

> be established . . . by testimony of . . . knowledgeable, competent expert witnesses if required by the court. A proposed expert witness may only be found competent to testify if the foundation for his or her testimony is first laid establishing that: (1) The opinion is actually held by the expert witness; (2) *the opinion can be testified to with reasonable medical probability*; (3) the expert witness possesses professional knowledge and expertise coupled with knowledge of the applicable standard of care to which his or her expert opinion testimony is addressed; (4) the expert witness's

---

[10]This version of the statute was effective from June 29, 2017 to May 28, 2019.

> opinion is grounded on scientifically valid peer-reviewed studies if available; (5) *the expert witness maintains a current license to practice medicine* with the appropriate licensing authority of any state of the United States: Provided, That the expert witness's license has not been revoked or suspended in the past year in any state; and (6) *the expert witness is engaged or qualified in a medical field in which the practitioner has experience and/or training in diagnosing or treating injuries or conditions similar to those of the patient.* If the witness meets all of these qualifications and devoted, at the time of the medical injury, sixty percent of his or her professional time annually to the active clinical practice in his or her medical field or specialty, or to teaching in his or her medical field or specialty in an accredited university, there shall be a rebuttable presumption that the witness is qualified as an expert.

W. Va. Code § 55-7B-7(a) (2015) (emphasis added). Clearly, those requirements focus on medical doctors, and it would be absurd (if not impossible) to have a licensed physician opine to a "reasonable medical probability" as to sufficiency of a security system. Although Defendant CHH states that Plaintiff has disclosed a "'Certified Healthcare Safety Professional' to offer healthcare safety opinions,"[11] and an orthopedic surgeon, those disclosures do not create a claim arising under the MPLA. Presumably, Plaintiff made those designations to meet its burden of proof on the claims it has raised, which the Court finds are outside of the MPLA.

Defendant CHH next argues the Amended Complaint should be dismissed because, as the West Virginia Supreme Court said in *Strahin v. Cleavenger*, 603 S.E.2d 197 (W. Va. 2004), "[g]enerally, owners or occupiers of land have no duty to protect visitors to their property from the deliberate criminal conduct of third parties 'because the foreseeability of risk is slight, and because of the social and economic consequences of placing such a duty on a person.'" 603 S.E.2d at 205 (quoting *Miller v. Whitworth*, 455 S.E.2d 821, 825 (1995)). "This rule holds whether the

---

[11] *Def.'s Reply in Supp. of Mot. to Dismiss the Pl.'s Am. Compl.*, at 7.

person injured by the third party is a social guest, a tenant, an occupant, or a business invitee." *Scott v. Taco Bell Corp.*, 892 F. Supp. 142, (S.D. W. Va. 1995). However, there are exceptions to this general rule, which include:

> (1) when a person has a special relationship which gives rise to a duty to protect another person from intentional misconduct **or** (2) when the person's affirmative actions or omissions have exposed another to a foreseeable high risk of harm from the intentional misconduct. *Restatement (Second) of Torts §§* 302B cmt. e and 315 (1965).

*Strahin*, 603 S.E.2d at 205 (emphasis added in *Strahin*; quoting *Miller*).

In *Miller*, the West Virginia Supreme Court cited with approval the *Restatement (Second) of Torts* § 314A (1965), which identifies certain entities, by their status alone, that have a special relationship giving rise to a duty to protect. 455 S.E.2d at 825 n.4; *see also Doe v. Wal-Mart Stores, Inc.*, 479 S.E.2d 610 (W. Va. 1996) (per curiam) (discussing *Miller's* approval of the Restatement). As relevant here, two of the situations identified in the Restatement that give rise to a special relationship include "[a] possessor of land who holds it open to the public is under a similar duty to members of the public who enter a response to invitation" and "[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other." *Id*. With respect to whether a landlord may be held liable for criminal activity, the West Virginia Supreme Court explained in *Miller* that, although general knowledge of criminal activity is not alone enough to impose a duty, the facts must be considered on a case-by-cases basis and "a duty will be imposed if a landlord's affirmative actions or omissions have unreasonably created or increased the risk of injury to the tenant from the criminal activity of a third party." Syl. Pt. 6, in part, *Miller*. In *Doe*, the West Virginia Supreme Court further relied upon the Restatement and

said that, "[u]nlike a landlord, a possessor of land who holds the land open to members of the public to enter in response to his invitation, by virtue of his status alone, does have a duty to protect persons on the premises from criminal activity of their parties." 479 S.E.2d at 616.

In light of these pronouncements, Plaintiff argues that the hospital in this case had a duty to protect J.C. from intentional misconduct because it had a special relationship with him as contemplated in *Miller*, *Doe*, and the Restatement. Specifically, Plaintiff alleges in the Amended Complaint that the hospital had a custodial relationship with J.C., a hapless infant, and "voluntarily or otherwise assumed a duty to provide for [his] protection and safety[.]" *Am. Compl.* at ¶25, in part. Plaintiff also contends a special relationship was formed because Defendant CHH, as owner of the premises, invited the public, including J.C., to use its services. Additionally, Plaintiff contends that Defendant CHH's security lapses exposed him to a foreseeable high risk of harm from the intentional misconduct. Upon consideration, the Court finds that these allegations and arguments that a special relationship existed creating a duty that was breached are sufficient to survive Defendant CHH's Rule 12(b)(6) challenge.

Defendant CHH next argues that Plaintiff's claim of Tort of Outrage fails as a matter of law. In order to establish outrage under West Virginia law, a plaintiff must show:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Syl. Pt. 3, in part, *Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419 (W. Va. 1998) (referring to a claim for intentional or reckless infliction of emotional distress, also known as a tort of outrage). The *Travis* court further explained a claim requires conduct that is "'more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct.'" *Id*. at 425 (citation omitted). "Whether conduct may reasonably be considered outrageous is a legal question," Syl. Pt. 4., *id*., which courts determine on a "case-by-case basis." *Hines v. Hills Dep't Stores, Inc.*, 454 S.E.2d 385, 390 (W. Va. 1994) (citing *Restatement (Second) of Torts* § 46).

Here the Amended Complaint alleges that Defendant CHH breached its duty to protect J.C., an infant in its care, and J.C. suffered intentional abuse and multiple broken bones from the criminal acts of an individual or individuals who had access to him as a result of the breach. Additionally, Plaintiff asserts Defendant CHH knew or should have known that its failure to properly establish, enforce, and supervise security measures would result in harm. This Court has no difficulty finding these allegations are sufficient under *Travis* to allege a tort of outrage. Therefore, the Court denies Defendant CHH's motion to dismiss this claim.

Lastly, Defendant CHH seeks to dismiss Plaintiff's Count V for *Res Ipsa Loquitor* because it is an evidentiary rule, not a separate cause of action. *See Crum v. Equity Inns, Inc.*, 685 S.E.2d 219, 229 (2009) ("It is well established that the principle of res ipsa loquitur does not create a cause of action. It is, rather, an evidentiary principle[.]"); *McClenathan v. Rhone-Poulenc, Inc.*, 926 F. Supp. 1272, 1281 (S.D. W. Va. 1996) (*res ipsa loquitur* "does not constitute independent cause of action"). Upon review, the Court agrees. Therefore, the Court **GRANTS** Defendant CHH's motion and **DISMISSES** Count V.

## IV.
## CONCLUSION

Accordingly, for the foregoing reasons, the Court **GRANTS** Defendant CHH's motion with respect to Count V, but **DENIES** the remainder of the motion. Plaintiff also filed a Motion to File a Sur-Reply, which includes a Motion to Strike Certain Portions of Defendant's Reply. ECF No. 82. Although Defendant CHH's Reply does contain information that is irrelevant to its motion to dismiss, the Court ignored that information and finds it would be confusing to strike portions of the Reply or have Defendant CHH file a revised Reply at this time. The Court also finds a Sur-Reply unnecessary. Therefore, the Court **DENIES** Plaintiff's motion.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:  October 22, 2020

_____
ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE